1   **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7            **FOR THE DISTRICT OF ARIZONA**

8

9   Arizona State Department of Education, )    No. CV-06-1719-PHX-DGC
                                          )
10             Plaintiff,                 )    **ORDER**
                                          )
11  vs.                                   )
                                          )
12                                        )
    United States Department of Education; )
13  Margaret Spellings, in her capacity as )
    Secretary of the United States         )
14  Department of Education,               )
                                          )
15             Defendants.                )
                                          )
16  _____ )

17

18          The Arizona State Department of Education ("ADE") has filed this action against the

19  United States Department of Education ("USDE") and Margaret Spellings, Secretary of the

20  USDE ("Secretary").  Dkt. #1.  ADE's claim for declaratory relief concerns the meaning of

21  a particular provision in the No Child Left Behind Act of 2001 ("NCLB), 20 U.S.C. §§ 6301

22  *et seq*.

23          Defendants have filed a motion to dismiss the complaint pursuant to Rules 12(b)(1)

24  and 12(b)(6) of the Federal Rules of Civil Procedure.  Dkt. #9.  ADE has responded and

25  Defendants have filed a reply. Dkt. ##16-17.  The Court heard oral argument on February 1,

26  2007. Having considered the parties' arguments and the applicable legal authority, the Court

27  concludes that this case must be dismissed for lack of subject matter jurisdiction.

28

1    **I.     Motion to Dismiss Standard.**

2           In ruling on a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), the Court

3    must accept all material factual allegations in the complaint as true.  *Carson Harbor Village,*

4    *Ltd. v. City of Carson*, 353 F.3d 824, 826 (9th Cir. 2004); *Smith v. Jackson*, 84 F.3d 1213,

5    1217 (9th Cir. 1996).  The Court must also assume that all general allegations "embrace

6    whatever specific facts might be necessary to support them."  *Peloza v. Capistrano Unified*

7    *Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994).  The Court may not assume, however, that the

8    plaintiff can prove facts different from those alleged in the complaint.  *Associated Gen.*

9    *Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *Jack*

10   *Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir.

11   2005).

12   **II.    Background Facts.**

13          This description of the facts is taken from ADE's verified complaint and the relevant

14   statutes.  As noted above, all allegations of the complaint are assumed to be true for purposes

15   of this decision.

16          Title I of the Elementary and Secondary Education Act of 1965 ("ESEA") provides

17   for federal educational grants to states that meet certain requirements.  Pub. L. No. 89-10, 79

18   Stat. 27 (codified as amended at 20 U.S.C. §§ 6301-7941).  On January 8, 2002, President

19   George W. Bush signed into law the NCLB, a comprehensive educational reform package

20   that amended the ESEA.  Pub. L. No. 107-110, 115 Stat. 1425.  The primary purpose of the

21   NCLB is to "ensure that all children have a fair, equal, and significant opportunity to obtain

22   a high-quality education and reach, at a minimum, proficiency on challenging state academic

23   achievement standards and state academic assessments."  20 U.S.C. § 6301.

24          The NCLB requires each state that receives Title I funds to determine that its public

25   schools are making "adequate yearly progress" ("AYP") toward enabling all students to meet

26   the state's academic achievement standards.  20 U.S.C. § 6311(b)(2).  A school's AYP is

27   determined through the use of standardized tests.  The NCLB requires that such tests be

28   given annually to all students, including students whose grasp of English is limited – referred

1  to in the NCLB as "limited English proficient" ("LEP") students.   20 U.S.C.

2  § 6311(b)(3)(C)(ix); *see* 34 C.F.R. § 200.6(b).  To accommodate the special needs of LEP

3  students, the NCLB provides that such students, during their first three years of school in the

4  United States, "shall be assessed in a valid and reliable manner and provided reasonable

5  accommodations on assessments . . . including, to the extent practicable, assessments in the

6  language and form most likely to yield accurate data on what such students know and can do

7  in academic content areas[.]"  20 U.S.C. § 6311(b)(3)(C)(ix)-(x); *see* 34 C.F.R. § 200.6(b).

8  Generally speaking, a school fails to make AYP if one of certain specified subgroups

9  of students in any grade fails to meet the state's academic achievement standards.  20 U.S.C.

10  § 6311(b)(2)(I).  A school that fails to make AYP may be identified under the NCLB for

11  improvement, corrective action, or restructuring.  20 U.S.C. § 6316(b)(1)-(8).  A school may

12  appeal any such identification to the state educational agency on the ground that the

13  identification "is in error for statistical or other substantive reasons[.]"   20 U.S.C.

14  § 6316(b)(2)(B).  The agency is required to consider the appeal before making a final

15  determination as to the school's identification status.  *Id.*

16  Arizona's standardized test for determining whether its schools are making AYP is

17  the Arizona Instrument to Measure Standards ("AIMS") test.  A.R.S. § 15-741.  Consistent

18  with the NCLB, AIMS tests are given annually to all Arizona public school students.  *See*

19  Dkt. #1 ¶ 9; 20 U.S.C. § 6311(b)(2)-(3).

20  In November 2000, Arizona voters approved Proposition 203, an initiative measure

21  regarding English language education for public school students.  *See* A.R.S. §§ 751-755.

22  Proposition 203 requires, among other things, that all annual standardized tests be given in

23  English. *See* A.R.S. § 15-755.  This requirement prohibits Arizona schools from testing LEP

24  students in their native languages as permitted by the NCLB.  Dkt. #1 ¶ 12; *see* 20 U.S.C. §

25  6311(b)(3)(C)(ix).

26  Concerned about the results of testing LEP students in English, the Superintendent of

27  ADE engaged in negotiations with the USDE regarding the possible exclusion of LEP

28  student test scores from the determination of whether schools make AYP. Dkt. #1 ¶ 12. The

1   negotiations ultimately led to the following 2003 agreement:  ADE would follow the general

2   policy of including the tests scores of all LEP students who had completed at least two years

3   of school; any school that failed to make AYP as a result of such scores could appeal that

4   determination under § 6316(b)(2)(B); ADE would have discretion under § 6316(b)(2)(B) to

5   grant such appeals and authorize schools to exclude the test scores of LEP students during

6   their first three years at the school.  *Id.* ¶ 15.  ADE implemented this agreement and began

7   granting the appeals.

8          In April 2005, a team from the USDE monitored ADE's practices under the NCLB.

9   The team issued a monitoring report that found that ADE's practice of granting appeals under

10  § 6316(b)(2)(B) and allowing schools to exclude test results from LEP students violated the

11  NCLB.  The report required ADE to "cease the practice of allowing appeals on the basis of

12  . . . LEP students with less than three years of language education services."  *Id.* ¶¶ 25-26.

13  **III.    Does the Court Have Subject Matter Jurisdiction?**

14         As noted above, § 6316(b)(2)(B) permits state educational agencies to consider

15  whether a particular school's AYP determination "is in error for statistical or other

16  substantive reasons[.]"   ADE contends that it has discretion under this provision to exclude

17  LEP student test scores that do not accurately reflect the type of academic progress with

18  which the NCLB is concerned.  Dkt. #1 ¶ 21.  ADE claims that if it continues to grant

19  appeals based on its interpretation of § 6316(b)(2)(B), it risks a determination by the USDE

20  that its academic assessment program fails to comply with the NCLB.  *Id.* ¶ 28.  ADE further

21  claims that under the General Education Provisions Act ("GEPA"), 20 U.S.C. §§ 1221-1240,

22  the USDE can require Arizona to refund all Title I funds used in violation of the NCLB and

23  can withhold future funding based on such violations.  *Id.* ¶ 29 (citing 20 U.S.C. §§ 1234a,

24  1234d).  Title I funds received by Arizona currently exceed $250,000,000 per year.  Dkt. #9

25  at 6.  ADE asks the Court to declare that § 6316(b)(2)(B) grants ADE "discretion to consider

26  the fact that [LEP] students in Arizona must be assessed in English in determining whether

27  a proposed AYP identification is in error for statistical or other substantive reasons, and . .

28  . to continue to grant appeals as it has been doing."  Dkt. #1 at 7-8.

1    Defendants note that while the USDE has found ADE to be in violation of the NCLB,

2  the Secretary has not initiated an enforcement action.   Dkt. #9 at 9. Defendants argue

3  that ADE's request for declaratory relief regarding the Secretary's interpretation of

4  § 6316(b)(2)(B) is a pre-enforcement challenge foreclosed by the comprehensive

5  enforcement and review scheme of the GEPA, 20 U.S.C. §§ 1234-1234i. *Id.*

6    The GEPA provides the Secretary with various tools for enforcing the provisions of

7  any "applicable program." 20 U.S.C. §§ 1234a-f (authorizing the Secretary to recover and

8  withhold funds, issue cease and desist orders, enter into compliance agreements, and take any

9  other action authorized by law).  The GEPA defines "applicable program" as "any program

10 for which the Secretary or the [USDE] has administrative responsibility as provided by law

11 or by delegation of authority pursuant to law."   20 U.S.C. § 1221(c)(1).   The NCLB

12 constitutes an "applicable program" under the GEPA because the USDE is the federal agency

13 responsible for administering it. *See Cal. Dep't of Educ. v. Bennett*, 833 F.2d 827, 829 n.4

14 (9th Cir. 1987) (stating that the USDE was responsible for administering the NCLB's

15 predecessor statute, Title I of the ESEA); *Bell v. New Jersey & Pennsylvania*, 461 U.S. 773,

16 780-93 (1983) (holding that the USDE had the administrative responsibility of making the

17 initial determination of the appropriate use of Title I funds under the GEPA); *see also* Dkt.

18 #1 ¶ 5 (alleging that the USDE "is an agency of the United States of America charged with

19 administering the [NCLB]").

20    When the Secretary undertakes an enforcement action, the GEPA requires that notice

21 of the alleged violation be given to the alleged offender.   20 U.S.C. §§ 1234a(a)(1),

22 1234d(b), 1234e(a)(2).   The alleged offender is then entitled to a hearing before an

23 administrative law judge within the USDE. 20 U.S.C. §§ 1234a(b)-(c), 1234d(c), 1234e(b).

24 The administrative law judge's decision may be appealed to the Secretary, who reviews it

25 for "substantial evidence."  20 U.S.C. § 1234d(e).  If the Secretary does not set aside the

26 decision, it becomes a final agency action after 60 days.  20 U.S.C. § 1234d(f).   If the

27 Secretary sets aside or modifies the judge's decision, it becomes a final agency action upon

28 written notice to the alleged offender. *Id.*  Any final agency action may be appealed to the

1  United States Court of Appeals.  20 U.S.C. §§ 1234a(g), 1234d(f), 1234g(a)-(b).  Actual

2  enforcement may occur only after judicial review is completed.  20 U.S.C. § 1234a(f).

3  Defendants cite *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), in support of

4  their argument that ADE's claim is a pre-enforcement challenge precluded by the GEPA.

5  Dkt. #9 at 9. In *Thunder Basin*, the Supreme Court held that the enforcement and review

6  procedures of the Federal Mine Safety and Health Amendments Act ("Mine Act"), 30 U.S.C.

7  § 801 *et seq.*, prevented a district court from exercising jurisdiction over a mine operator's

8  pre-enforcement challenge to an order issued by the Secretary of Labor.  510 U.S. at 202.

9  Defendants argue that the enforcement and review procedures of the Mine Act are similar

10 in all respects to the enforcement and review procedures of the GEPA, and that, like the

11 district court in *Thunder Basin*, this Court lacks subject matter jurisdiction.  Dkt. #9 at 9-14.

12 The question is one of Congressional intent.  Congress created federal district courts,

13 and Congress determines the scope of their jurisdiction.  As the Supreme Court said long ago,

14 "[c]ourts created by statute can have no jurisdiction but such as the statute confers." *Sheldon*

15 *v. Sill*, 49 U.S. (8 How.) 441, 449 (1850).  Thus, "[i]n cases involving delayed judicial review

16 of final agency actions, we shall find that Congress has allocated initial review to an

17 administrative body [rather than to the district courts] where such an intent is 'fairly

18 discernible in the statutory scheme.'" *Thunder Basin*, 510 U.S. at 207 (quoting *Block v.*

19 *Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)) (footnote omitted).  "Whether a statute is

20 intended to preclude judicial review is determined from the statute's language, structure, and

21 purpose, its legislative history, and whether the claims can be afforded meaningful review."

22 *Id.* (citation omitted).

23 The language of GEPA does not answer the question.  Nothing in the statute expressly

24 precludes pre-enforcement judicial review in district court.  The structure, purpose, and

25 legislative history of the GEPA persuade the Court, however, that the statute was intended

26 to create a comprehensive scheme of administrative and judicial review that precludes

27 actions in district court.  On these issues the Court finds the recent decision in *Connecticut*

28 *v. Spellings*, 453 F. Supp. 2d 459 (D. Conn. 2006), to be thorough, thoughtful, and sound.

1  The comprehensive enforcement and review scheme of the GEPA is analogous to the

2  Mine Act at issue in *Thunder Basin*.  *Id.* at 482-84 (comparing 20 U.S.C. §§ 1234d and

3  1234g with 30 U.S.C. §§ 814, 816, and 823).  The GEPA is designed to channel disputes

4  over the Secretary's interpretation of the statutes she administers to the USDE for review,

5  followed by appeal to the Court of Appeals.  The legislative history of GEPA confirms that

6  Congress sought to create "a comprehensive system for enforcement by the [Secretary] of

7  the requirements related to educational programs."  H.R.Rep. No. 95-1137, at 141 (1978)

8  (cited in *Spellings*, 453 F. Supp. 2d at 484).  That comprehensive system does not include

9  pre-enforcement review in federal district court.

10  The Court accordingly concludes that ADE's claim in this case, like the State of

11  Connecticut's claim in *Spellings*, is an impermissible pre-enforcement challenge under the

12  GEPA.  *Spellings*, 453 F. Supp. 2d at 482-89; *see Bell*, 461 U.S. at 778 (holding that the

13  GEPA requires final agency action before judicial review is available); *South Dakota v.*

14  *Alexander*, 968 F.2d 1, 2 (8th Cir. 1992) (holding that the State was not entitled to judicial

15  review of the Secretary's preliminary decision seeking refund of Title I funds because the

16  decision was not a final agency action under the GEPA).

17  ADE makes several arguments to the contrary.  Dkt. #16 at 6-13.  The Court

18  concludes that none of them has merit.

19  First, ADE argues that the "Supreme Court has long recognized a 'strong presumption

20  that Congress intends judicial review of administrative action.'"  *Id.* at 6-7 (quoting *Bowen*

21  *v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)).  As the Supreme Court

22  explained in *Thunder Basin*, however, "[b]ecause court of appeals review is available [under

23  the administrative scheme], this case does not implicate the strong presumption that Congress

24  did not mean to preclude judicial review."  510 U.S. at 207 n. 8 (internal quotation marks and

25  citation omitted).

26  Second, ADE argues that the GEPA is distinguishable from the Mine Act at issue in

27  *Thunder Basin*.  Dkt. #16 at 7-8.  ADE notes that Congress specifically had amended the

28  Mine Act to prevent mine operators from filing suit in district court to delay the abatement

1    of Mine Act violations, and that no such specific Congressional intent is apparent here.  ADE

2    also notes that this action was not filed to delay the abatement of violations of the NCLB, but

3    to remedy the damages suffered by ADE and Arizona schools as a result of Defendants'

4    violation of their agreement and incorrect interpretation of § 6316(b)(2)(B).  It is true that

5    this case lacks the clear Congressional effort to limit district court review that was evident

6    in *Thunder Basin*, and therefore presents a closer question.  The Court concludes,

7    nonetheless, that the overall structure, purpose, and legislative history of the GEPA fairly

8    reflect an intent to preclude the type of pre-enforcement judicial review sought by ADE. *See*

9    *Spellings*, 453 F. Supp. 2d at 489.

10           Third, ADE argues that the administrative procedures established in the GEPA are not

11   sufficient and cannot be allowed to foreclose adjudication of ADE's claim.  Dkt. #16 at 9.

12   The Court does not agree.  ADE alleges that the USDE has ordered ADE to cease the

13   practice of granting appeals in violation of § 6316(b)(2)(B). *See* Dkt. #1 ¶ 25.  The GEPA

14   provides for administrative review of the USDE order.  20 U.S.C. § 1234e.  Granted, such

15   review will be available only after the Secretary's commences an enforcement action, but it

16   will be available.  The GEPA provides a "'meaningful and adequate opportunity for judicial

17   review' after final agency action." *Spellings*, 435 F. Supp. 2d at 484 (citation omitted); *see*

18   20 U.S.C. § 1234g.

19           Fourth, relying on an exception recognized in *Thunder Basin*, ADE argues that its

20   claim is "wholly collateral" to the GEPA's administrative review process and outside

21   USDE's expertise because the claim involves "the specific factual details of an agreement

22   reached by the parties and the effect of [ADE's] reliance on that agreement."  Dkt. #16 at 9;

23   *see Thunder Basin*, 510 U.S. at 213.  As counsel for ADE rightly conceded at oral argument,

24   however, the agreement between ADE and USDE cannot alter the meaning and effect of

25   § 6316(b)(2)(B), nor can it nullify the provision.  The alleged agreement might constitute

26   evidence that ADE's interpretation of the provision is correct and was once embraced by the

27   USDE, but at the end of the day the dispute between the parties will turn on the meaning and

28   effect of § 6316(b)(2)(B), a question that falls squarely within USDE's expertise and the

1  comprehensive review provisions of the GEPA.  *See Spellings*, 453 F. Supp. 2d at 487

2  (holding that interpretation of unfunded mandate provision of the NCLB is not wholly

3  collateral to the GEPA's administrative review process because it "falls squarely within the

4  expertise of the Secretary[.]"); *Thunder Basin*, 510 U.S. at 214 ("Petitioner's statutory claims

5  at root require interpretation of the parties' rights and duties  under [the Mine Act], and as

6  such . . . fall squarely within the Commission's expertise.").

7      Fifth, ADE cites federal cases that have assumed jurisdiction over pre-enforcement

8  actions and argues that this Court should follow suit.  Dkt. #16 at 10 (citing *Gen. Elec. Co.*

9  *v. EPA*, 360 F.3d 188 (D.C. Cir. 2004); *Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868 (3d

10  Cir. 1996); *Rocky Mtn. Radar, Inc. v. FCC*, 158 F.3d 1118 (10th Cir. 1998)).  The cases cited

11  by ADE are plainly distinguishable from this case.  Both *General Electric* and *Kreschollek*

12  involved collateral constitutional challenges to entire administrative schemes.  *Gen. Elec.*,

13  360 F.3d at 188 ("The General Electric Company appeals the dismissal of its amended

14  complaint alleging that the administrative orders regime of [CERCLA] violates the Due

15  Process Clause of the Fifth Amendment."); *Kreschollek*, 78 F.3d at 869 ("Kreschollek's

16  claim presents a new twist on the question [of jurisdiction] because his challenge to the

17  Longshore Act is a constitutional one[.]").  ADE has asserted no such constitutional

18  challenge. *Rocky Mountain Radar* involved an administrative scheme that did not preclude

19  pre-enforcement actions.  158 F.3d at 1122.  For the reasons explained above, the GEPA

20  does.

21      Sixth, ADE argues that Arizona should not be forced to violate the Secretary's

22  mandate and risk onerous financial penalties – potentially, the loss of hundreds of millions

23  of dollars in Title I funding – in order to obtain a judicial ruling on the meaning of

24  § 6316(b)(2)(B). The Supreme Court has recognized that serious due process concerns might

25  arise when a party must either obey the law and thereby forego the possibility of judicial

26  review, or risk severe penalties in order to gain access to the courts. *Thunder Basin*, 510 U.S.

27  at 218 (majority opinion), 221 (Scalia, J., concurring).  Some courts have treated the issue

28  not as a constitutional problem, but as an exception to the preclusion rule of *Thunder Basin*,

1    stating that the exception applies when judicial review is effectively foreclosed because "the

2    penalty for violation is set so high that no rational person would dare test the legality of

3    administrative action by refusing to comply." *E. Bridge, LLC v. Chao*, 320 F.3d 84, 90 (1st

4    Cir. 2003).

5           Whether treated as a due process concern or an exception to *Thunder Basin*, these

6    principles do not aid ADE. Counsel for Defendants asserted during oral argument that ADE

7    may obtain judicial review of § 6316(b)(2)(B) without risking severe penalties. This is how:

8    ADE is required by the NCLB to file and obtain approval of an educational plan for Arizona

9    (20 U.S.C. § 6311(a)); ADE may file with the Secretary a proposed amendment to the plan

10   that includes ADE's interpretation of § 6316(b)(2)(B); if the Secretary rejects the plan

11   amendment, ADE may seek immediate judicial review in district court under the

12   Administrative Procedures Act.  By this means, Defendants assert, ADE can obtain judicial

13   review of its interpretation of § 6316(b)(2)(B) without risking serious sanctions.  When

14   questioned about this assertion during oral argument, counsel for ADE agreed that judicial

15   review of § 6316(b)(2)(B) can be obtained in this manner.  Thus, as was true of the plaintiff

16   in *Thunder Basin*, ADE is not precluded from obtaining meaningful judicial review by the

17   risk of severe penalties.  As the district court recognized in *Spellings*:  "Because the refusal

18   to approve a plan amendment may be reviewed by a district court without the risk of the State

19   losing federal funding, the State is able to continue to comply with the [NCLB] while at the

20   same time seeking judicial review of it's claims regarding the [NCLB]." *Spellings*, 453 F.

21   Supp. 2d at 488.[1]

22          Finally, ADE argues that this Court should exercise jurisdiction because continued

23   administrative review before ADE will be futile. Dkt. #16 at 12-13. When Congress enacted

24   GEPA, however, it knew that the statute "contemplates judicial review only *after* the

25   [Secretary] has determined that a state has violated the [NCLB]." *Spellings*, 453 F. Supp. 2d

26   at 486-87 (emphasis in original). Requiring "final agency action, even if the ultimate results

27

28          [1]Like the court in *Spellings*, this Court states no opinion on the nature or scope of such
     judicial review under the Administrative Procedures Act.  453 F. Supp. 2d at 488 n. 17.

1  can be surmised, is not at all futile" because it may resolve the issue between the parties and

2  "judicial review would be enhanced by forcing the parties to take concrete positions at the

3  administrative level and by development of a full administrative record."  *Id.* at 489.

4  **IV.    Conclusion.**

5        This Court lacks subject matter jurisdiction over this pre-enforcement declaratory

6  judgment action regarding the meaning of § 6316(b)(2)(B).  The Court accordingly will grant

7  Defendants' motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil

8  Procedure.[2]

9        **IT IS ORDERED:**

10        1.      Defendants' motion to dismiss (Dkt. #9) is **granted**.

11        2.      The Clerk of Court shall **terminate** this action.

12        DATED this 5th day of February, 2007.

13

14

15  _____
                        David G. Campbell
16                      United States District Judge

17

18

19

20

21

22

23

24

25        [2]During oral argument, counsel for ADE requested leave to amend the complaint.
    When questioned closely on this issue, counsel made clear that the amendment would
26  address only the current injury being suffered by ADE.  Because the proposed amendment
    would be relevant only to issues the Court need not address in light of its ruling on the
27  jurisdictional question – the ripeness and standing issues raised by the USDE's motion – the
    Court sees no need to permit the amendment before entering this ruling. The Court also need
28  not address Defendants' argument that the complaint fails to state a claim for relief.